UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TE CONNECTIVITY
CORPORATION,

    Plaintiff,

v.

LEAR CORPORATION,

    Defendant.

Case No.

Hon.

_____

**VERIFIED COMPLAINT**

Plaintiff TE Connectivity Corporation ("TE"), through its attorneys, Troutman Pepper Hamilton Sanders LLP, for its Complaint states as follows:

**INTRODUCTION**

A party may not be compelled to participate in an arbitration to which it did not consent. Defendant Lear Corporation ("Lear") seeks to sidestep this important legal principle to hale TE into an arbitration proceeding without any contractual basis. On February 10, 2022, Lear filed a Demand for Arbitration against TE arising out of an ongoing supply chain cost dispute between these suppliers to the automotive industry. But TE never agreed to arbitrate its disputes with Lear. While Lear points to an arbitration provision contained within its own Purchase Order Terms and Conditions, TE made clear in its dealings with Lear that all orders

would be subject to TE's Terms and Conditions of Sale. Indeed, TE responded to each Lear order by issuing documents that expressly rejected Lear's Purchase Order Terms and Conditions and stated that TE's acceptance of orders from Lear was expressly conditional on Lear's assent to TE's Terms and Conditions of Sale. Lear thereafter assented to TE's Terms and Conditions of Sale by, *inter alia*, repeatedly accepting deliveries of the requested parts. The TE Terms and Conditions of Sale therefore govern the sale of goods between the parties. Importantly, TE's Terms and Conditions of Sale do not include an arbitration provision.

Furthermore, even if Lear did not assent to TE's Terms and Conditions of Sale, TE's conditional acceptance operated as a rejection of the Lear Purchase Order Terms and Conditions. Accordingly, under Article 2 of the Uniform Commercial Code, the parties' supply relationship would be governed by the terms upon which they agree, together with any supplementary terms from the U.C.C., none of which include an arbitration provision. Under no circumstances is the parties' supply relationship subject to arbitration. Nevertheless, Lear purported to commence an Arbitration before the American Arbitration Association ("AAA"), which the AAA has stated will continue unless it is provided with a court order enjoining its proceedings. TE brings this action to obtain a declaratory judgment that it is not subject to the Arbitration initiated by Lear and a preliminary and permanent injunction enjoining the Arbitration from proceeding.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff TE, together with its affiliates, is a global industrial technology leader, with a broad range of connectivity and sensor solutions in transportation, industrial applications, medical technology, energy, data communications and consumer households. TE is incorporated under the laws of Pennsylvania with its registered office in Berwyn, Pennsylvania. TE maintains an office located in Troy, Michigan.

2. Upon information and belief, Defendant Lear is incorporated under the laws of Delaware and maintains its headquarters in Southfield, Michigan.

3. Jurisdiction is proper in this Court as the parties purposefully availed themselves of the privilege of acting within this State by directly involving their respective Michigan locations and personnel in the underlying commercial transaction and related dispute.

4. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties have complete diversity of citizenship and the amount in controversy is greater than $75,000.

5. Venue is proper in this District under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### *THE PARTIES' SUPPLY RELATIONSHIP*

6. TE, together with its affiliates, is a global leader in supplying

connector and terminal components for automotive and other applications.

7. Lear is a manufacturer of seating and e-systems, which it supplies to various original equipment manufacturers ("OEMs").

8. TE supplied Lear with electrical connector terminal parts and other related parts (collectively, the "Parts") for incorporation into Lear's products.

9. Lear's products were thereafter supplied to various OEMs for installation in their consumer vehicles.

10. TE supplied the Parts to Lear through a defined process. After Lear was selected by certain OEMs as the Tier I supplier, it generally issued Requests for Quotation to TE for the Parts. In response, TE would issue Quotations for the referenced Parts, which incorporated the TE Terms and Conditions of Sale ("TE T&Cs") by reference.

11. From time to time thereafter, Lear would issue blanket purchase orders, known as Production Purchase Orders, for the Parts. These Production Purchase Orders set forth the price Lear was willing to pay for the Parts. The Production Purchase Orders did not request a quantity of Parts to purchase and, as a result, did not require any action by TE. The Production Purchase Orders purported to be governed by Lear's Purchase Order Terms and Conditions ("Lear T&Cs").

12. Upon Lear's issuance of Scheduling Agreement Releases, which set forth the specific quantity of Parts Lear wished to purchase at the prices set forth

in the Production Purchase Orders, TE issued documents known as Order Acknowledgments and/or Change Information for Scheduling Agreements.

13. In the TE T&Cs, Order Acknowledgments, and Change Information for Scheduling Agreements, TE made clear that the sale and purchase of the Parts between TE and Lear are governed by the TE T&Cs. Indeed, each Order Acknowledgment and Change Information for Scheduling Agreement explicitly provides that "All sales are subject to [the TE T&Cs], which have been previously provided to purchaser. Additional copies [are available] on request. The [TE T&Cs] may only be modified upon the written consent of TE Connectivity."

14. The TE T&Cs themselves unequivocally provide that "Any term or condition in any printed form of Buyer . . . which is in any way inconsistent or in addition to the terms and conditions hereof is hereby expressly rejected, and Seller's acceptance of any offer or order of Buyer is hereby expressly made in reliance on Buyer's assent to all terms and conditions hereof . . ."

15. The TE T&Cs further provided Lear with the opportunity to object to the terms within ten calendar days and clearly noted that "Failure to so object shall be conclusively deemed to be acceptance of the terms and conditions hereof."

16. TE sent an Order Acknowledgment or Change Information for Scheduling Agreement incorporating this language in response to each Scheduling

-5-

Agreement Release issued by Lear. Each document was sent to physical mailing or electronic addresses as specified by Lear. Based upon the incorporated TE T&Cs, each document constituted a conditional acceptance of Lear's orders under U.C.C. § 2-207(1).

17. During all times relevant to this Complaint, Lear accepted delivery of and paid for the Parts from TE.

18. Lear therefore assented to the TE T&Cs, and as such, the TE T&Cs governed the parties' supply relationship.

19. Alternatively, even if Lear did not assent to the TE T&Cs, TE's responsive documents operated as a rejection and counteroffer of Lear's Production Purchase Orders and Scheduling Agreement Releases such that no contract was formed under the Lear T&Cs. If Lear did not assent to TE's conditional acceptance, then the parties' conduct – rather than their writings – established a contract. Under U.C.C. § 2-207(3), the parties' contract is governed by the terms on which the parties agree, together with any supplementary terms incorporated under the Uniform Commercial Code, none of which include an arbitration provision. Under no circumstance did the parties make an agreement to arbitrate.

### TE REITERATES THAT ITS TERMS CONTROL AFTER LEAR TAKES DEBITS

20. Since the onset of the COVID-19 global pandemic in March 2020, automotive suppliers have been faced with industry-wide shortages of parts

and raw materials.

21. Despite the immense challenges to the entire global automotive industry, TE has supplied the Parts to Lear as timely as practicable and otherwise consistent with TE's affirmative contractual obligations.

22. TE's performance notwithstanding, at the start of 2021, Lear began unilaterally debiting account payables to TE for costs, including production downtime and expedited freight, allegedly arising out of late deliveries solely from TE.

23. While Lear asserted that the Lear T&Cs permitted it the right to debit amounts it alleged were owing from suppliers, the Lear T&Cs did not govern the supply relationship between the parties. As alleged *supra*, the parties' supply relationship was governed by the TE T&Cs.

24. Following a series of commercial discussions, TE and Lear resolved their initial dispute over Lear's debits in July 2021.

25. Following resolution of this initial debit dispute, TE made clear, in no uncertain terms, that the TE T&Cs would govern the parties' relationship moving forward.

26. For example, in a July 16, 2021 letter from TE to Lear, TE stated that, in light of Lear's prior unlawful debits and inflated claims, it was making clear once again that its terms and conditions controlled. TE stated that "Lear's

DocVerify ID: D1D8B8CD-D423-44F4-9BB0-5C724EFA419B
www.docverify.com
Page 7 of 15
75C724EFA419B

acceptance of any future deliveries by TE shall constitute Lear's agreement to TE terms and [to] pay TE for the full piece price for such goods under the applicable purchase order(s) without setoff, debit or reduction of any kind." TE also noted that future documents issued by the company in response to Scheduling Agreement Releases would reflect that the quantities of Parts provided by TE and the dates on which those Parts are delivered would be subject to global supply chain constraints and TE's output capacity.

27. In an August 3, 2021 letter, TE reiterated that "Lear's acceptance of any future deliveries by TE shall constitute Lear's agreement to TE terms and conditions and to pay TE the full piece price for such goods under the applicable purchase order(s) without setoff, debit, or reduction of any kind."

28. Following these communications, TE issued Change Information for Scheduling Agreements in response to each Scheduling Agreement Release, stating, through its incorporated terms and conditions, that any acceptance of orders from Lear was expressly conditional on Lear's assent to the TE T&Cs. TE emphasized that its Change Information for Scheduling Agreements were "not intended to create a legally binding obligation to deliver a specific quantity of product(s) by a specific date" and that "all orders and any future deliveries will be governed by and subject to global supply chain constraints and the limitations of TE Connectivity's output capacity."

29. Notwithstanding TE's unambiguous communications, Lear once again assessed substantial debits from amounts owed to TE.

30. In total, Lear assessed approximately $2.3 million in debits following the resolution of the parties' initial debit dispute in July 2021.

31. Upon being notified by TE that its new, unlawful debits constituted a material breach of the parties' agreement, Lear reversed these debits.

### *LEAR INITIATES AN ARBITRATION TO WHICH TE DID NOT CONSENT*

32. On February 10, 2022, Lear purported to commence an Arbitration against TE before the American Arbitration Association ("AAA").

33. Lear filed a Demand for Arbitration in which it asserted, *inter alia*, that it was entitled to assess its since-reversed debits and that the parties' dispute was subject to arbitration pursuant to the Lear T&Cs.

34. On February 24, 2022, TE served an Answering Statement in which it stated as follows:

> TE unequivocally denies that it is subject to an agreement to arbitrate with Claimant Lear Corporation ("Lear") and fully disputes that the American Arbitration Association ("AAA") has jurisdiction over this matter. TE did not assent to any agreement to arbitrate with Lear. The supply relationship between TE and Lear is governed by the TE Terms and Conditions of Sale, which does not contain an agreement to arbitrate . . . Because AAA lacks jurisdiction over the parties, it cannot adjudicate the instant dispute. By filing this Answering Statement, TE does not consent to the instant arbitration and does not waive any rights to legally challenge AAA's jurisdiction over the dispute

-9-

between TE and Lear. As such, TE submits this Answering Statement with a full reservation of all rights, claims, and defenses.

35. Through this Answering Statement, TE informed the AAA that there is a dispute regarding whether an agreement to arbitrate was formed.

36. Accordingly, the issue of whether this dispute is subject to arbitration is reserved exclusively for the Court.

37. Despite this well-settled principle, the AAA informed the parties that it will proceed with the Arbitration, including adjudicating whether this dispute is arbitrable.

38. On March 10, 2022, the AAA informed the parties that it was scheduling an Administrative Conference for March 17, 2022, presumably to discuss the selection of an arbitrator and a timetable for hearings. The AAA also invited TE to file an Answering Statement.

39. On March 15, 2022, TE informed AAA that it had previously filed its Answering Statement in which it denied that TE is subject to an agreement to arbitrate with Lear and disputed that the AAA has jurisdiction over this matter. TE reiterated that because the formation of an agreement to arbitrate is in dispute, the issue of arbitrability must first be decided by a Court.

40. In response, the AAA stated that under Rule R-5(c) of the AAA Commercial Arbitration Rules, because Lear met the AAA's filing requirements by

filing a demand and naming AAA as the dispute resolution provider, "the AAA will proceed with administration of the arbitration," unless presented with a court order enjoining administration, notwithstanding that the formation of an agreement to arbitrate is in dispute.

41. As TE informed AAA and Lear, Rule R-5(c) does not apply to the instant dispute. It only applies where "the respondent alleges that a different arbitration provision is controlling . . ." TE does not allege that a different arbitration provision is controlling. It alleges that there is no arbitration provision whatsoever between the parties.

42. The AAA subsequently invited the parties to provide submissions regarding the arbitrability of their dispute.

43. In response, TE informed the AAA and Lear that it would not be participating in this process and reiterated that the instant dispute is not subject to arbitration. Consistent with the AAA's instruction that it would proceed unless presented with a court order enjoining further administration of the Arbitration, TE stated that it would be commencing the instant litigation. *See* Ex. 1, Letter to AAA.

44. The AAA has since scheduled further proceedings, including the timing for selecting an arbitrator.

## COUNT I
## DECLARATORY JUDGMENT

45. TE incorporates its preceding allegations by reference.

-11-

46. The parties dispute their respective rights under the Production Purchase Orders, Scheduling Agreement Releases, and Change Information for Scheduling Agreements exchanged between the parties.

47. An actual controversy exists between the parties regarding their respective rights under disputed contractual terms sufficient to warrant the Court declaring the rights of the parties.

48. TE is entitled to a court declaration that TE is not legally bound to arbitrate Lear's asserted claims in the Demand for Arbitration.

## COUNT II
## INJUNCTIVE RELIEF

49. TE incorporates its preceding allegations by reference.

50. TE is entitled to a preliminary and permanent injunction enjoining the Arbitration purportedly commenced by Lear on February 10, 2022.

51. TE is likely to succeed on the merits of its claim that the instant dispute is not subject to arbitration because the plain language of the TE T&Cs and correspondence with Lear make clear that the TE T&Cs, which do not contain an arbitration provision, govern the parties' supply relationship. Alternatively, if Lear did not assent to the TE T&Cs, the parties' agreement is governed by the terms on which they agree, together with any supplementary terms incorporated under the Uniform Commercial Code, none of which include an arbitration provision.

52. TE will suffer irreparable harm if the injunction is not issued because it will be forced to either participate in an arbitration to which it did not consent, or abstain and risk a default.

53. Conversely, Lear would not suffer any harm by an injunction ordering it to honor its contractual obligations.

54. Finally, the issuance of an injunction protecting a litigant from participating in an arbitration to which it did not consent is in the public interest.

## PRAYER FOR RELIEF

**WHEREFORE,** TE requests this Honorable Court order as follows:

A. Declaratory relief under 28 U.S.C. § 2201 that TE is not bound to arbitrate Lear's asserted claims in the February 10, 2022 Demand for Arbitration;

B. Preliminary and permanent injunctive relief under Fed. R. Civ. P. 65 enjoining the purported arbitration commenced by Lear on February 10, 2022;

C. An award of actual legal fees and other costs to TE; and

D. All such other relief as this Court may deem just, equitable, or appropriate under the circumstances.

Respectfully submitted,

*/s/ Sean. P. McNally*
Sean P. McNally (P66292)
Joshua L. Zeman (P80055)
Vincent C. Gianino (P85565)
TROUTMAN PEPPER HAMILTON SANDERS LLP
4000 Town Center, Suite 1800
Southfield, MI 48075



                                        (248) 359-7300
                                        sean.mcnally@troutman.com
                                        josh.zeman@troutman.com
                                        vincent.gianino@troutman.com

Dated: April 6, 2022

-14-

DocVerify ID: D1D8B8CD-D423-44F4-9BB0-5C724EFA419B
www.docverify.com
Page 14 of 15    145C724EFA419B

## VERIFICATION

I, Gus Kokos, an authorized representative of Plaintiff TE Connectivity Corporation, first being duly sworn, reviewed the factual information set forth in the Verified Complaint above, and verify, based upon my personal knowledge, the factual information in the Verified Complaint is true and accurate to best of knowledge, information and belief.

*Gus Kokos*
Signed on 2022/04/06 11:48:18 -8:00

_____
GUS KOKOS

On this __6th__ day of April, 2022, before me, a Notary Public in and for said County, Gus Kokos, personally appeared, to me known to be the same person described in and who executed the foregoing instrument, and who acknowledged to me that he executed the same as his voluntary act and deed.

*[Signature]*
Signed on 2022/04/06 11:48:18 -8:00

_____
Notary Public
State of Pennsylvania, Chester County
Acting in ___Chester___ County
My Commission Expires: Oct. 2, 2023

Commonwealth of Pennsylvania - Notary Seal
Janette Marie Chamberlin, Notary Public
Chester County
My Commission Expires Oct 02, 2023
Commission Number 1358528

Notarial act performed by audio-visual communication



# TE_Lear Verified Complaint - Final.pdf

| | |
|---|---|
| DocVerify ID: | D1D8B8CD-D423-44F4-9BB0-5C724EFA419B |
| Created: | April 06, 2022 11:31:14 -8:00 |
| Pages: | 15 |
| Remote Notary: | Yes / State: PA |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

### E-Signature Summary

**E-Signature 1: Gus Kokos (GK)**
April 06, 2022 11:48:18 -8:00 [1D1154301715] [73.64.91.250]
gkokos@te.com (Principal) (ID Verified)

**E-Signature Notary: JANETTE MARIE CHAMBERLIN (JMC)**
April 06, 2022 11:48:18 -8:00 [14DCAEED49C0] [136.226.53.83]
chamberj@pepperlaw.com
I, JANETTE MARIE CHAMBERLIN, did witness the participants named above electronically sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat. All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.

